**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| In re | : | |
| **Latex Foam International, LLC,** *et al.*, | : | |
| Debtors | : | **District Court No.: 3:21-cv-01311 (VLB)** |
| | : | |
| ────────────────────── | : | **Bankruptcy Court No.: 19-51064 (JAM)** |
| | : | |
| **Official Committee of Unsecured** | : | |
| **Creditors of Latex Foam** | : | |
| **International, LLC,** *et al.*, | : | |
| Appellant | : | **March 8, 2023** |
| | : | |
| **v.** | : | |
| | : | |
| **Entrepreneur Growth Capital,** | : | |
| Appellee | : | |

<u>**ORDER AND MEMORANDUM OF DECISION**</u>

The Official Committee of Unsecured Creditors of Latex Foam International, LLC (the "Committee") brings this appeal of the United States Bankruptcy Court for the District of Connecticut (Manning, C.J.) (the "Bankruptcy Court") Order Granting Entrepreneur Growth Capital, LLC's ("EGC") Motion for Payment of Secured Creditor Claim and Fee Application ("Order") and Articulation of Factual Findings and Legal Principles ("Articulation").  The Committee argues that the Bankruptcy Court erred in approving and awarding EGC's request for postpetition interest at the contract default interest rate.

For the following reasons, the order of the Bankruptcy Court is affirmed.

I.      BACKGROUND

On August 8, 2019 (the "Petition Date"), Latex Foam International, LLC doing business as Talalay Global and various related entities (collectively, the

"Debtors") each filed voluntary Chapter 11 bankruptcy petitions.  (BK ECF No. 1.)[1] The cases were consolidated into a single case for joint administration.  (BK ECF No. 2, 49.)  Three of the largest unsecured creditors came together and established an Official Committee of Unsecured Creditors—the Committee.  (BK ECF No. 69.)   The Debtors continued to manage their properties as debtors-in-possession throughout the proceedings until the sale of their assets in June 2020.  (*See* BK ECF No. 48, 606.)

As of the Petition Date, EGC was the Debtors' principal secured creditor with a claim of $9,342,934.33.  (BK ECF, Claims Register 22.)  The debt owed to EGC relates to an amended and restated loan and security agreement between the Debtors and SummitBridge National Investments IV, LLC ("SummitBridge") in December 2015 (the "Loan Agreement").  (*Id.*, Part 3 (hereinafter "Loan Agreement").  As stated in the Loan Agreement, the contract was intended to amend, restate, supersede, and consolidate an original loan agreement entered in April 2006.  (Loan Agreement 6.)  The Loan Agreement was negotiated and executed to act as exit funding for the Debtors' prior Chapter 11 bankruptcy case. (Articulation 7, BK ECF No. 993.)  The agreement allowed the Debtors' to exit and carry on their business with a fresh start.  (*Id.*)

Two clauses of the Loan Agreement are of special importance to this decision, both of which address matters relating to default under the agreement. First, in the Loan Agreement, the parties agreed that an event of default includes the filing of a voluntary case under the federal Bankruptcy Code.  (*Id.* 33–34.)

---

[1] When citing to filings in *In re: Latex Foam International, LLC*, Bankr. D. Conn. 19-51064(JAM), the Court will preface the electronic filing number with "BK."

Second, the parties agreed that, if an event of default occurs, all outstanding obligations would bear interest at the default rate of 3% in excess of the rate otherwise applicable to the loan on such date.  (*Id.* 9, 16.)

The non-default interest rate is defined under the Loan Agreement as "a rate per annum equal to the greater of (a) 5.00% or (b) the Prime Rate, plus the Applicable Margin."  (*Id.* 17.)  The "Applicable Margin" is defined as "2.00%, subject to increase pursuant to section 2.5.3(e)."  (*Id.* 7.)  Section 2.5.3(e) generally provides for an increase in the Applicable Margin to 4.00% if the borrower declines to take the option to a principal payment by January 31, 2018.  (*Id.* 14.)  It is unclear from the record whether the Applicable Margin was 2.00 or 4.00%.  By the Courts estimation, the non-default interest rate between December 2015 (when the Loan Agreement was finalized) and June 2020 (when default interest was awarded) ranged between approximately 5.25% and 9.50%.[2]

On March 15, 2017, an allonge to the Loan Agreement was reached, transferring SummitBridge's rights under the Loan Agreement to EGC.  (BK ECF, Claims Register 22, Part 7.)

During the pendency of the Chapter 11 case, the Debtors secured a purchaser of substantially all of their assets.  On June 17, 2020, the Bankruptcy

---

[2] The non-default interest rate could have been as low as 5.25% between March 16, 2020 and July 2020, if the Applicable Margin was 2.00% as the prime rate was 3.25% at the time.  *See Historical Prime Rate*, JPMorgan Chase & Co., https://www.jpmorganchase.com/about/our-business/historical-prime-rate (last visited Feb. 17, 2023).  The non-default rate could have been as high as 9.50% between December 20, 2018 and July 21, 2019, if the Applicable Margin was 4.00% as the prime rate was 5.50% at the time.  *Id.*

Court issued an order authorizing and approving the sale.  (BK ECF No. 606.)  The sale proceeds provided funding for the Debtors to pay EGC the principal amount of its claim and interest at the nondefault contract rate.  (*Id.* 14.)  During a proceeding around the time of the sale, counsel for EGC estimated that the sale proceeds were to exceed EGC's secured claim by about $1 million.  (BK ECF No. 710 7:12–15.)

Shortly after the sale was approved by the Bankruptcy Court, EGC filed a "Motion for Payment of Secured Creditor Claim and Fee Application."  (Mot. for Payment, BK ECF No. 619.)  In the motion, EGC moved for payment of its secured claim in its entirety, including default interest, attorneys' fees and costs, and appraisal expenses.  (*Id.*)  EGC stated it was owed $9,043,973.74 in principal and $10,551.44 in interest at the non-default contract rate, for a total of $9,054,525.18 as of June 8, 2020.  (*Id.* 2.)  In addition, EGC claimed an entitlement to unpaid interest at the default rate of 3% totaling $237,684, (*id.* 7), which was calculated as accruing from the Petition Date through June 15, 2020, (Landis Decl. in support of Mot. for Payment, BK ECF No. 691-1.)  The Committee objected to this motion, arguing that EGC was not entitled to default interest.  (BK ECF No. 648.)

On July 15, 2020, the Bankruptcy Court conducted a hearing on EGC's motion and took the matter under advisement.  (BK ECF No. 666.)  On July 31, 2020, the Bankruptcy Court issued an order summarily granting EGC's motion and awarding default interest in the amount of $237,684.19 as of June 15, 2020 with a per diem accrual thereafter.  (Order, BK ECF No. 670.)

The Committee appealed the Bankruptcy Court's order granting EGC's motion for default interest in August 2020.  ('20 Appeal ECF No. 1.)[3]  The Committee and EGC filed briefs, based on the legal theories discussed by the Bankruptcy Court during the July 15, 2020 hearing.  ('20 Appeal ECF Nos. 18, 20, 23.)  This Court remanded for articulation.  ('20 Appeal ECF No. 29.)

Following remand, the Bankruptcy Court issued an articulation of its factual findings and legal principles.  (Articulation, BK ECF No. 993.)  The Bankruptcy Court explained that default interest was awarded to EGC because (a) EGC was deemed to be an 'oversecured' creditor, (b) as an oversecured creditor, EGC was entitled to interest on such claim as provided for under 11 U.S.C. § 506(b), and (c) events of default occurred justifying an award of interest and of the amount default interest provided for under the terms of the Loan Agreement.  (*Id.*)  In assessing whether default interest should be afforded, the Bankruptcy Court noted the presumption in favor of applying the contractual default rate balanced against equitable considerations that may limit application of that rate.  (*Id.* 3–5.)

The Committee appeals the Order and Articulation.  (ECF No. 1.)

II.     STANDARD OF REVIEW

The district court has jurisdiction to hear an appeal from final judgments, orders, and decrees of the bankruptcy court pursuant to section 158(a)(1) of Title 28 of the United States Code.  A district court reviewing the decision of a bankruptcy court is to review "the bankruptcy court's factual findings for clear

---

[3] When citing to filings in *In re: Latex Foam, LLC*, D. Conn. 20-cv-1200(VLB), the Court will preface the filing number with "'20 Appeal."

error and its legal conclusions *de novo*." *In re Motors Liquidation Co.*, 957 F.3d 357, 360 (2d Cir. 2020).

III.     DISCUSSION

The Committee argues the Bankruptcy Court erred in awarding EGC default interest at the contractual default rate.  The following is a brief overview of the concept of default interest.  Default interest is a bargained-for risk-management provision of a repayment contract that benefits both borrowers and lenders.  As explained by the Second Circuit in *Ruskin*:

> [Default interest] can be beneficial to a debtor in that it may enable
> him to obtain money at a lower rate of interest than he could
> otherwise obtain it, for if a creditor had to anticipate a possible loss
> in value of the loan due to his debtor's bankruptcy or reorganization,
> he would need to exact a higher uniform interest rate for the full life
> of the loan. The debtor has the benefit of the lower rate until the
> crucial event occurs; he need not pay a higher rate throughout the
> life of the loan.

*Ruskin v. Griffiths*, 269 F.2d 832 (2d Cir. 1959). Default interest also benefits the lender, because it tries to compensate the lender for lost value of a repayment contract that occurs when a debtor defaults.  The following illustrates this concept.  Assume A lends $100 to B at a 2% interest rate.  The 2% interest rate is calculated to compensate A for both the time value of money and the risk A assumes that B may not pay the loan in full.  As a result of the agreement, A walks away with an asset—that is B's promise to pay A $100 plus 2% interest. The value of A's asset is calculated based on the total amount owed to A over the life of the loan minus the possibility B may fail to pay the loan in full.  The value of this asset can decrease for circumstances outside of A's control, such as B becoming less likely to pay the loan in full (also referred to as creditworthy).

Some events that could increase the risk of B not paying the debt in full include B taking on more debt than it can afford to repay or if B's assets become severely depleted.  In order to mitigate this risk, A could demand a higher uniform interest rate.  Or the parties could agree that if certain events occur which render B less credit worthy (commonly referred to as events of default), A is entitled to a higher interest rate and/or an acceleration of the due date to reflect and compensate for the increased risk of late or non-payment.  These types of provisions allow the value of the loan to remain steady and encourages lower uniform interest rates.

### A.    Post-Petition Default Interest

The first issue before the Court is whether the Bankruptcy Court erred in granting EGC's request for default interest at the contractual default interest rate of 3% in excess of the rate otherwise applicable under the Loan Agreement.

The Court's inquiry must start with the language of the Bankruptcy Code, because if the language of the Code is plain "the sole function of the courts is to enforce it according to its terms."  *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (hereinafter "*Ron Pair*").  Section 506(b) provides in full:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

Here, it is undisputed that EGC has an oversecured claim entitled to relief under 506(b).  The Supreme Court in *Ron Pair*, in reviewing the plain meaning of

506(b), found that when 506(b) is properly invoked, "[r]ecovery of post-petition interest is unqualified."[4]  489 U.S. at 241.

The dispute in this case is not whether EGC was entitled to interest on its claim, the dispute is how much interest EGC is entitled to receive.  While the statute provides that oversecured creditors "shall be allowed . . . interest" it does not state how much interest.   The lack of instruction in calculating interest under 506(b) is apparent by the provision immediately following the interest provision, which provides clear direction that when awarding fees, costs, or charges, the award must be reasonable and be provided for under the agreement or State statue under which the claim arose.  The "interest of such claim" provision provides no similar instruction on how to calculate the award.

Without the benefit of instruction in section 506(b), the Court will consider relevant legal precedent.  It is important to note here that section 506(b) is a relatively nascent statute, enacted with the Bankruptcy Code in 1978.[5]  The parties have not provided, nor has the Court been able to locate, any binding

---

[4] The issue before the Supreme Court in *Ron Pair*, was whether section 506(b) "entitles a creditor to receive postpetition interest on a nonconsensual oversecured claim allowed in a bankruptcy proceeding."  489 U.S. at 237.  In deciding that is does, the Court carefully read of section 506(b).  The Court reasoned the phrase "interest on such claim" was not modified by the phrase "under the agreement or State statute under which such claim arose." *Id.* at 241– 42.  "As a result, the phrase 'interest on such claim' stands independent of the language that follows." *Id.* at 241.  Thus, section 506(b) provides two forms of relief to an oversecured creditor: (1) "interest on such claim," and (2) "any reasonable fees, costs, or charges provider for under the agreement or State stature under which such claim arose."  When the Supreme Court said post-petition interest is "unqualified," it meant that interest can be awarded notwithstanding a lack of agreement or State statute.

[5] The Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549, enacted the Bankruptcy Code, which replaced the Bankruptcy Act of 1898, as amended, and was a comprehensive revision of the bankruptcy laws.

precedent from the Supreme Court or the Second Circuit addressing default interest under the Code.

Even where the Code is silent on an issue, courts are permitted to turn to pre-Code precedent where the legislative history does not explain that the Code was effecting a major change to the pre-Code practice. *See Dewsnup v. Timm*, 502 U.S. 410, 419 (1992). Here, the legislative history does not evince an intent to change pre-Code precedent. Rather, the only mention of 506(b) in the legislative history discusses the clause providing for reasonable fees, costs, or charges. Specifically, in a section-by-section analysis in the House Report on the Bankruptcy Reform Act of 1978, the authors state that:

> Subsection (b) codifies current law by entitling a creditor with an oversecured claim to any reasonable fees, costs, or charges provided under the agreement under which the claim arose. These fees, costs, and charges are secured claims to the extent that the value of the collateral exceeds the amount of the underlying claim.

H.R. REP. 95-595, 356–57, 1978 U.S.C.C.A.N. 5963, 6312. The only legislative history that mentions relief to oversecured creditors under section 506(b) indicates an intent to codify current law, *albeit* law unrelated to the issue currently before the Court. Because the statute is silent on the rate of postpetition interest, as well as the legislative history, and the closest analogue addressed by Congress in the legislative history conveys an intent to apply pre-Code law, the Court concludes that pre-Code law governs the rate of postpetition interest an oversecured creditor is entitled to. This conclusion was similarly reached by the Fifth Circuit in *In re Layman*, 958 F.2d 72 (5th Cir.), *cert. denied*, 506 U.S. 917 (1992).

9

There are very few precedential pre-Code cases addressing default interest, but of the cases addressing this issue, a common theme applies—equity.  In *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156 (1946), the Supreme Court denied default interest to an oversecured creditor primarily because the cause of default was the product of the insolvency proceedings, particularly an order of the court for the debtor to not pay the secured creditor.  In denying default interest, the Supreme Court explained that "[i]t is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor."  *Id.* at 165.  In *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959), the Second Circuit found the debtor was required to pay at the default interest rate—which was 2% more than the pre-default interest rate—primarily because the debtor was solvent and, thus, able to pay all creditors.  In addition to the debtor's solvency, the Second Circuit noted the inequity of allowing "the debtor to escape the expressly-bargained-for result of its act."  *Id.* at 832.  Other circuit courts have uniformly recognized that the amount of default interest to be awarded is subject to equitable considerations. *In re SW Boston Hotal Venture, LLC*, 748 F.3d 393, 414–15 (1st Cir. 2014); *In re Terry Ltd. Partnership*, 27 F.3d 241 (7th Cir. 1994); *In re Laymon*, 958 F.2d 72 (5th Cir.).

In reviewing how much to afford an oversecured creditor in default interest, a majority of courts in this circuit have adopted "a presumption in favor of applying a contractual default rate of interest, 'subject to equitable

considerations.'"  *Urb. Communicators PCS Ltd. P'ship v. Gabriel Cap., L.P.*, 394 B.R. 325, 338 (S.D.N.Y. 2008).  *See also In re Residential Capital, LLC*, 508 B.R. 851, 856 (Bankr. S.D.N.Y. 2014) (hereinafter *ResCap*); *In re Vest Assocs.*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998).

Though some courts have listed a limited number of situations that warrant modification of the contract rate, see *In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012), there is no binding precedential authority supporting a limited test.  Rather, the instruction to balance the equities remains.  *See Vanston*, 329 U.S. 165.  Balancing equities requires consideration of all relevant circumstances that allow the court to exercise equitable discretion.  Here, the Bankruptcy Court and the parties address the equities in this case under the limited considerations framework applied in non-binding precedent.  Thus, for the purpose of this decision, the Court will frame its analysis based in part on the framework followed by the parties.  This framework proposes consideration of: (1) whether the secured creditor is guilty of misconduct, (2) whether the application of the contractual interest rate would harm unsecured creditors or impair the debtor's fresh start, and (3) whether the contractual interest rate constitutes a penalty.  *In re 785 Partners LLC*, 470 B.R. at 134.  However, the Court considers all of the relevant circumstances that are present on appeal.

a. *Misconduct*

The Bankruptcy Court found no evidence of misconduct on the part of EGC.  (Articulation 4.)  The Committee does not directly challenge the Bankruptcy

Court's finding.  The Committee does make scattered allegations about EGC through out its briefing, which the Court will address here.

First, the Committee argues it is inequitable for EGC to receive default interest as an "opportunistic investor, [who] purchased the loan at a discount, . . ."  (Committee Br. 13.)  The Committee seems to suggest it is unfair for an investor who purchases a security agreement to receive the benefit of default interest under 506(b).  The Committee cites to no legal authority, nor presents persuasive argument to support this proposition.  Logically, when EGC purchased the loan from SummitBridge, it purchased it relying on the provisions that protect the value of the loan in the event of default (i.e., payment of default interest).  It would be unfair to deny a secured creditor the value of its asset simply because it was not the original lender.    Thus, the Court rejects the Committee's argument.

Next, the Committee argues it is inequitable for EGC to be entitled to default interest because EGC was hostile to the Chapter 11 process by fighting it while still getting paid adequate protection payments and legal fees.  (Committee Br. 9, 9 n.8.)  In support of the allegation of "hostility," the Committee states that EGC did not give the Debtors post-petition financing, would not consent to the debtor using cash collateral, and exercised tight control over the Debtors' operating budget.   The Committee made this argument before the Bankruptcy Court during oral arguments, to which the Bankruptcy Court responded: "[EGC] had the right to fight the process along the way.  You didn't get to use their cash collateral without their consent.  That's what the bankruptcy code provides."  (Tr.

7/15/2020 p.27, BK ECF No. 693.)  The Court agrees with the Bankruptcy Court's reasoning, it is not hostile for a secured creditor to refuse to loan more money to a debtor in bankruptcy and try to limit the loss of its asset by using the tools the Code provides.

Thus, the Court agrees with the Bankruptcy Court, the record fails to show evidence of misconduct on the part of EGC.

### b. Penalty

The Bankruptcy Court found that "the 3% contract default interest rate does not constitute a penalty."  (Articulation 5 (citing to *Ruskin*, 269 F.2d at 832 and *In re Heavy*, 608 B.R. 341, 354 (Bankr. E.D.N.Y. 2019).)  Again, the Committee does not challenge this finding on appeal.

Default interest is a bargained-for risk management provision that allows for lower uniform interest rates while protecting the lender's value in the loan.  A default interest provision on its own does not constitute a penalty.  Some courts have found that a significant spread between non-default and default interest rate could constitute a penalty, where others have not.  *See In re 53 Stanhope, LLC*, 625 B.R. 573, 580–81 (Bankr. S.D.N.Y. 2021) (collecting cases for both sides). Even if a significant spread could constitute a penalty, the Committee does not argue that the spread here is significant, nor could it because the spread is only 3%.  *See In re Heavey*, 608 B.R. 341, 354 (Bankr. E.D.N.Y. 2019) (finding 12% spread does not constitute a penalty); *In re 785 Partners, LLC*, 470 B.R. at 136 n.7 (5% spread); *In re Liberty Warehouse Assoc. Ltd. Partnership*, 220 B.R. 546, 552 (Bankr. S.D.N.Y. 1998) (8.8%).

Thus, the Court agrees with the Bankruptcy Court, the contract default rate here does not constitute a penalty, it is compensatory.

### c.    *Harm to Unsecured Creditors*

The primary dispute on appeal is the Bankruptcy Court's findings and conclusions of the harm granting default interest at the contract rate could have to the unsecured creditors. The Bankruptcy Court stated that "application of the default interest rate provided for in the Loan [Agreement] does not harm the unsecured creditors." (Articulation 4.) The Committee argues on appeal that the Bankruptcy Court erred in concluding the application of default interest does not harm unsecured creditors. Though the Bankruptcy Court did not provide further detail following this one sentence in the Articulation, when read in context of the entire decision, it is clear the Bankruptcy Court understood the Debtors were insolvent and would not be able to pay their unsecured creditors and that any amount awarded to EGC could mean less available proceeds to pay the unsecured creditors. For example, in the Articulation the Bankruptcy Court stated that the confirmed Chapter 11 plan proposed a *pro rata* distribution to unsecured creditors, not payment in full. (*Id.*) The Bankruptcy Court also noted that "[c]ourts have awarded default interest even when the unsecured creditors would not be paid in full." (*Id.* (citing to *In re Residential Capital, LLC*, 508 B.R. 851, 854 (Bankr. S.D.N.Y. 2014) (hereinafter "*ResCap*") and *In re Madison 92nd St. Assocs., LLC*, 472 B.R. 189, 199 (Bankr. S.D.N.Y. 2012).) Thus, when the Articulation is read as a whole, it is clear that the Bankruptcy Court understood

an award of default interest would harm unsecured creditors.  The Court rejects the Committee's narrow interpretation of the Bankruptcy Court's findings.

The Committee argues generally that the Bankruptcy Court erred in application of the law with respect to harm to the unsecured creditors.  First, the Committee argues the Bankruptcy Court should not have relied on *ResCap* in granting default interest, because, in the Committee's view, that case justifies a ruling in their favor.   In *ResCap*, the bankruptcy court was faced with a somewhat similar issue as the issue before the Bankruptcy Court here; that is an insolvent debtor with an oversecured creditor that was awarded default interest even when unsecured creditors were harmed.  508 B.R. 851.  The bankruptcy court in *ResCap* afforded default interest, which was at a rate of 4% over the non-default rate and diminished the pool of assets available for distribution by roughly two-tenths of a percent.  *Id.* at 855, 860.  There, the bankruptcy court weighed the equities, focusing primarily on the pre-bankruptcy agreement terms in justifying the award.  Specifically, in *ResCap*, the secured debt agreement when the bankruptcy was filed was a modification of a prior agreement negotiated shortly before and with the expectation of, a bankruptcy filing.  *Id.* at 854–55.  The bankruptcy court  in *ResCap* noted how this pre-petition financing allowed the debtors to continue operating as a going concern benefiting all creditors by maintaining the value of the debtors' assets through the eventual sale.  *Id.* at 859–61.

In some respects, the circumstances in *ResCap* tend to lean closer towards denying default interest than those in this case.  For example, the difference in

the non-default rate and the default rate was 4% in *ResCap*, *id.* at 855, but is only

3% here.  In addition, the default interest award reduced the available

distributable assets by about two-tenths of a percent in *ResCap*, *id.* at 860, and

here the reduction is roughly two-hundredths of a percent.  The Committee,

however, focuses largely on the value-additive conduct of the secured creditor in

*ResCap* and distinguishes that conduct from the conduct of EGC in this case.  In

other words, the Committee is arguing EGC was not as helpful to the

reorganization as the secured creditor was in *ResCap* and thus they should not

be awarded the same relief. This argument was addressed and rejected above.

The fact that EGC was not inclined to lend the Debtor money as a going concern

is not an equitable justification for denying it the terms of the bargained-for

default interest rate.  While a secured creditor extending post-petition financing

may be a justification for granting default interest in some cases, such as

*ResCap*, the inverse is not necessarily true.  It would be inequitable to deny an

oversecured creditors rights to the terms of its contract simply because it was

unwilling to extend post-petition financing or acquiescence in all of the debtor's

financial management decisions.

Second, the Committee argues the Bankruptcy Court's reliance on *Madison*

was wrong.  In *Madison*, the bankruptcy court granted default interest at the non-

bankruptcy statutory rate over the debtor's objection.  472 B.R. 189.  The *Madison*

bankruptcy court noted that the secured creditor was not guilty of misconduct,

there was no argument that the rate was a penalty, and there was no issue with

respect to receiving a fresh start because the debtor was liquidating.  *Id.* at 199.

16

The *Madison* bankruptcy court focused in part on the potential harm to the unsecured creditors but noted that the debtor's counsel represented that it was possible all unsecured creditors would be paid regardless.  *Id.*  The bankruptcy court in *Madison* concluded that the debtor failed to establish prejudice to the unsecured creditors.  *Id.*  Here, the Committee argues that the Bankruptcy Court's reliance on *Madison* was wrong because, unlike in *Madison*, there is evidence of harm to the unsecured creditors here.  In the Articulation, the Bankruptcy Court discusses *Madison*, but doesn't go so far as to say it is factually analogous. Rather, the Bankruptcy Court discusses *Madison* to support the proposition that courts have awarded default interest even when the debtor is insolvent.  That reference is neither erroneous nor grounds for reversal.

Third, the Committee argues the Bankruptcy Court did not give due consideration to the district court's decision in *O'Brien v. Presidents Holding, LLC*, No. 3:13CV625(JBA), 2014 WL 12931380, at *5 (D. Conn. Feb. 10, 2014).  In *O'Brien*, the district court considered whether the secured creditor was entitled to the contractual default interest of 24% (which was 17.75% more than the non-default interest rate) where the estate was insolvent.  *Id.*  The court in *O'Brien* found the secured creditor was not entitled to the full contractual default interest rate "based on the insolvency of the estate, the magnitude of the default interest rate, and the size of the spread between the non-default and default interest rates."  *Id.* at *5.   The court in *O'Brien* reduced the default interest rate "to the highest amount that allows [the debtor] to repay its unsecured creditors in full." *Id.*  The Committee suggests that outcome in *O'Brien* established a rule that

post-petition default interest must be reduced to the highest amount that would allow for full repayment of unsecured creditors in all circumstances.  That is not what *O'Brien* stood for.

Further analysis of the decision in *O'Brien* is necessary for explaining why the outcome in that case is not persuasive here.  In discussing harm to unsecured creditors, the court in *O'Brien* relied heavily on *Urban Communicators PCS Ltd. Partnership v. Gabriel Capital, L.P.*, 394 B.R. 325 (S.D.N.Y. 2008) for the proposition that it is appropriate for a court to reduce an award of default interest to the point that would not prejudice subordinate creditors.  *O'Brien*, 2014 WL 12931380, at *4.  However, *Urban Communicators* is a very different case than the case here and even the case in *O'Brien*.  In *Urban Communicators*, the debtor was solvent.  394 B.R. at 338.  The issue in *Urban Communicators* was not how to balance creditor versus creditor, it was balancing creditor versus debtor.  The *Urban Communicator's* court found it inequitable to reduce a secured creditors default interest for the benefit of a debtor where there are no allegations of misconduct, the rate was not a penalty, and unsecured creditors were being paid in full.  *Id.*  The holding in *Urban Communicators*, as identified in *O'Brien*, is that "although the Court has discretion to reduce the post-petition default rate, it should only do so to the extent that would allow the unsecured creditors to be paid in full."  *O'Brien*, 2014 WL 12931380, at *4.  This holding does not provide that default interest should be reduced to the point where unsecured creditors are paid in full, as suggested by the Committee.  Rather, the holding provides that when there is a debtor versus creditor scenario, default interest should not be

18

reduced in a way that would solely benefit the debtor.  This holding is not applicable here, where the contest is between creditor versus creditor.  The holding was applicable in *O'Brien* because of the factors identified by that court, which includes the significant spread between the non-default and default rates.  Both Article 9 and the Bankruptcy Code recognize that secured creditors are entitled to be paid before unsecured creditors.  The question is, therefore, not whether the unsecured creditors are harmed, but rather whether they are unduly subordinated or harmed by the secured creditors priority status.

Regardless, the harm to unsecured creditors was not the sole justification for the court's decision in *O'Brien*, which also relied on the magnitude of the default interest rate (24%) and the sizeable spread of 17.75% interest between the non-default and default rate.  2014 WL 12931380, at *5.  The Bankruptcy Court here was correct in distinguishing *O'Brien* from this case, where the default interest is significantly lower, which is at most 9.5%, and the spread is noticeably less, at only 3%.

Fourth, the Committee argues that the Bankruptcy Court incorrectly relied on *United States v. Ron Pair Enterprises, Inc.* for the proposition that recovery of postpetition interest is "unqualified."  The Committee argues that this case involves <u>default interest</u>, where *Ron Pair* did not.  This is another unfair, narrow reading of the Bankruptcy Court's decision, which clearly understood that default interest is not "unqualified," based on the fact that it discussed and applied equitable considerations in reaching its decision.  Similarly, the Committee argues the Bankruptcy Court wrongfully held that the standard for default interest

is based on "reasonable[ness]," as the term is used in 506(b).  Again, this is an unfair, narrow interpretation of the Bankruptcy Court's decision for the same reasons as above.

Therefore, the Court rejects the Committee's arguments against the Bankruptcy Court's findings and conclusion on the harm to unsecured creditors.

### d.    Other Considerations

In addition to the considerations addressed above, the Court also considers the circumstances surrounding the formation of the Loan Agreement. SummitBridge, the predecessor secured creditor to the Loan Agreement, negotiated the terms of the Loan Agreement when the Debtor was in bankruptcy and provided the Debtor with the funding to exit that bankruptcy.   Providing financing to a debtor in bankruptcy can be risky.  However, providing exit funding is encouraged because it furthers a key goal of the Bankruptcy Code—to allow a Debtor to reorganize and continue as a going concern when feasible.  *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.").  The attendant consequence of not enforcing fair, bargained-for terms of a loan agreement formed under these circumstances could discourage creditors from providing financing to debtors in bankruptcy and thus would undermine a fundamental purpose of the Code as discussed.  Such a precedent would dissuade creditors from extending credit to debtors in bankruptcy to reorganize or to exact a higher interest rate and make it more difficult for debtors in

bankruptcy to reorganize.  Accordingly, the circumstances surrounding the Loan Agreement further supports for awarding the contractual default interest rate as was awarded here.

Therefore, for all the reasons stated above, the Court affirms the Bankruptcy Court's award of default interest under 506(b).

B.    Event of Default

The Court must also consider whether the Bankruptcy Court erred in finding there was an event of default warranting default interest under the terms of the Loan Agreement itself.  For, if there was no contractual enforceable event of default under the contract, EGC would not be entitled to default interest regardless of the equitable considerations discussed above.  The Bankruptcy Court found three events of default: (i) the failure to make scheduled payments; (ii) the failure to repay the entire outstanding balance as of the loan maturity date; and (iii) the filing of a voluntary bankruptcy petition.  (Articulation 6–8.)   However, the only event of default justifying the award afforded by the Bankruptcy Court— $250,498.56—must be the filing of bankruptcy,[6] and thus the Court will only consider whether the Bankruptcy Court erred in finding that the filing of a voluntary bankruptcy petition was an event of default.

The Bankruptcy Court found that the voluntary bankruptcy filing was an event of default under the Loan Agreement and the provision should be enforced. (Articulation 7.)   In reaching this conclusion, the Bankruptcy Court noted the

---

[6] The award of $250,498.56 represents the total default interest beginning to accrue on the Petition Date, not the subsequent date for missed payments or the loan's maturity.  In other words, the event of default must have been the filing of the bankruptcy to justify the amount of default interest awarded.

circumstances surrounding the formation of the Loan Agreement, which documented the crucial post-petition financing that enabled the Debtors to emerge from their prior bankruptcy as an ongoing concern and meet their financial obligations.  (*Id.*)

The Committee argues that the filing of a voluntary bankruptcy petition is a "technical default" that courts have refused to allow as a basis for default.  The Committee cites several bankruptcy court decisions and one out-of-circuit district court decision to support their argument.  The bankruptcy court in *In re 53 Stanhope, LLC*, 625 B.R. 573, 583–84 (Bankr. S.D.N.Y. 2021), reviewed all of the other in-circuit cases relied on by the Committee in its briefing[7] and found that "a mere bankruptcy default should not trigger default interest if it is clear that the debtor will be paying the non-debtor rate currently and ultimately will satisfy the claim under the chapter 11 plan."  Even if this was a test for finding the filing of a bankruptcy petition is an enforceable event of default, the Committee does not point to evidence that would satisfy this test.  The Court will not scour the totality of the enormous bankruptcy court record to try to determine on its own whether these circumstances are met.

The Court disagrees that the bankruptcy filing at issue in this case is a "technical default."  Here, SummitBridge and the Debtors specifically contemplated and negotiated the default interest rate to compensate the creditor for a potential bankruptcy.  (*Id.* 36–37.)  At the end of the provision, in all caps, the

---

[7] *In re Bowntree, LLC¸* No. 1-08-45854-dem, 2009 WL 2226107, at *4–5 (Bankr. E.D.N.Y. July 24, 2009); *In re Northwest Airlines Corp.,* No. 05-17930 (ALG), 2007 WL 3376895, at *6 (Bankr. S.D.N.Y. Nov. 9, 2007); *ResCap*, 2014 WL 12931380.

Loan Agreement provides: "BORROWERS ACKNOWLEDGE AND AGREE THAT THIS SECTION 8.5 IS A SPECIFIC AND A MATERIAL ASPECT OF THIS AGREEMENT AND THAT LENDER WOULD NOT ENTER INTO THIS AGREEMENT WITH BORROWERS IF THE PROVISIONS IN SECTION 8.5 WERE NOT PART OF THIS AGREEMENT."  (*Id.*)  For the Court to deem unenforceable the provisions of a negotiated agreement that expressly contemplated the circumstances present here, would be an unfair limitation on the power of parties to fairly contract. Thus, the Court rejects the Committee's argument that the Bankruptcy Court erred in finding the bankruptcy filing as an enforceable event of default triggering default interest.

Therefore, the Court affirms the Bankruptcy Court's award of the contractual default interest beginning on the Petition Date.

### IV. Conclusion

For the reasons stated above, the Court affirms the Bankruptcy Court's Order Granting EGC's Motion for Payment of Secured Creditor Claim and Fee Application.

IT IS SO ORDERED.

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated this day in Hartford, Connecticut:  March 8, 2023**